IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
        v.                       )   No. 15 C 6355
                                 )
DONELL A. THOMAS,                )
                                 )
            Defendant.           )


MEMORANDUM OPINION AND ORDER

In 2012, Donell Thomas ("Thomas") was sentenced to ninety-four months in prison after being convicted on charges of wire fraud and identity theft. Having unsuccessfully challenged his conviction on direct appeal, Thomas has filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. For the reasons stated below, the motion is denied.

**I. Background**

**Thomas's Scheme**

Thomas's wire fraud charges stem from his participation from 2008 to 2010 in a scheme involving short-term real estate sales in the Chicago area. Typically, these sales -- so-called "A-to-B, B-to-C" transactions -- involve an owner (A), who sells his property to a real estate investor or agent (B), who in turn resells the property immediately for a profit to an end-purchaser (C). A portion of the profit is then passed on to the

lender. To ensure repayment, lenders in these transactions typically require that the back-end, B-to-C sale take place shortly after, or simultaneously with, the A-to-B sale, and that the lender's funds for the A-to-B transaction not be disbursed until the title company receives the funds for the B-to-C transaction.

Thomas obtained loans for A-to-B purchases by falsely representing to lenders that the B-to-C transactions were already in place. In point of fact, if Thomas ever found purchasers for the B-to-C sales, it was not until weeks or months after the A-to-B sale. Although lenders believed that their funds would not be released from escrow until the B-to-C transactions had been completed, Thomas worked with Jon Orozco ("Orozco"), a closing agent at Chicago Abstract and Title Company, who would release the funds without the lenders' knowledge. Instead of paying off lenders with the proceeds from B-to-C sales, Thomas effectively orchestrated a Ponzi scheme, obtaining additional loans for A-to-B sales of the same properties. (The latter loans, too, were based on misrepresentations to lenders that B-to-C sales for the properties had been arranged). Thomas then used the proceeds from the second loan to repay the initial lenders and pocketed a portion for himself.

**The South Langley Property and the Aggravated Identity Theft Charge**

While Thomas's wire fraud charges were based on his misrepresentations regarding the B-to-C sales, his identity theft charge was based on an incident in which he additionally made misrepresentations regarding an A-to-B transaction. In October 2008, Thomas sought a $1,050,000 loan for the purported A-to-B purchase of a property on South Langley Avenue in Chicago (the "South Langley property"). Thomas prepared documents that listed "Oscar Corona" as the seller of the property and that bore Corona's signature. Corona was a bona fide investor from whom Thomas had purchased properties in the past, but Corona was not the owner of the South Langley property, and he had no idea that Thomas had used his name or forged his signature in order to procure a loan for the purported purchase of the property.

**The Evolution of Thomas's Scheme**

Near the end of 2008, Chicago Abstract and Title fired Orozco after discovering his fraudulent activity. As a result, Thomas began creating aliases and phony email addresses that mimicked those associated with legitimate title companies. Using these false identities, Thomas led lenders to believe that they were working with employees from genuine title companies such as Forshay Land and Title Company and Regent Title.

For example, in November and December 2009, Thomas sought a $325,000 loan from an individual investor named Jodi Funke ("Funke") for the purchase of a property on Gladys Avenue in Chicago. Thomas initially used the name "E. Justin Cox" in corresponding with Funke by phone and email. When Funke requested information regarding the closing agent for the deal, "Cox" told her that she would be contacted by "Michelle Martin" of Forshay Title. Funke then began receiving emails from someone purporting to be Michelle Martin and using the email address "michellem@forshayillinois.com." Funke later wired $325,000 for the purchase of the Gladys Avenue property. She was never repaid.

**The End of Thomas's Scheme**

Thomas's scheme finally began to unravel in June and July of 2010. At that time, Thomas used the name "Carrie Jonjevic" to contact a prospective lender named Bryant Marks ("Marks") of JV Funding in Hawaii. Marks later received an email from an individual identifying himself as "Chad J. Marks," using the email address "Chad@Regentllinois.com," who claimed to be the senior closing officer of Regent Title. When Marks eventually became suspicious and contacted Regent Title directly, he learned that the company had no employee by the name of "Chad Marks." Marks and Regent Title then began working with law enforcement authorities. Marks continued to correspond with

"Carrie Jonjevic" and "Chad Marks," pretending that he intended to proceed with the loan. Marks later met with Thomas at Regent Title for the closing. After the deal was completed, Thomas was arrested by FBI agents.

In all, Thomas obtained more than $38,000,000 in funding from five different lenders for more than eighty real estate transactions. Some of the lenders ultimately received their investments back through Ponzi payments, but three did not: Coastal Funding of Washington ("Coastal Funding") lost $1,370,000; First Funding Source of Colorado ("First Funding") lost $2,420,000; and Jodi Funke lost $325,000.

**Procedural History**

In September 2010, Thomas was indicted on wire fraud charges in violation of 18 U.S.C. § 1343. In superseding indictments, he was charged with additional counts of wire fraud, and with a single count of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). In July 2012, Thomas went to trial along with Lamar Chapman III, who had posed as Thomas's legal counsel during the scheme. The jury found both defendants guilty on all counts. I sentenced Thomas to seventy months' imprisonment on the wire fraud charges (the sentences to run concurrently), and twenty-four months' imprisonment on the aggravated identity theft charge (the sentence to run consecutively with the fraud sentence). Thomas's conviction was

affirmed on direct appeal. *See United States v. Thomas*, 763 F.3d 689, 693 (7th Cir. 2014). He now raises a collateral challenge to his conviction and sentence under § 2255.

## II. Discussion

Relief under § 2255 is reserved for extraordinary situations. *See, e.g., Hays v. United States,* 397 F.3d 564, 566 (7th Cir. 2005). To obtain relief under § 2255, a convicted defendant "must show that the district court sentenced him 'in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.'" *Harris v. United States,* 366 F.3d 593, 594 (7th Cir. 2004) (quoting 28 U.S.C. § 2255). Hence, relief is appropriate under § 2255 "only for an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Id*. (quotation marks removed).

In support of his motion, Thomas argues that his sentence was imposed in violation of his Sixth Amendment right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). "Counsel is unconstitutionally ineffective if his performance is both deficient, meaning his errors are 'so serious' that he no longer functions as 'counsel,' and

prejudicial, meaning his errors deprive the defendant of a fair trial." *Maryland v. Kulbicki*, 136 S. Ct. 2, 3 (2015) (per curiam) (quoting *Stickland*, 466 U.S. at 687).

Thomas asserts that his attorney's[1] performance was unconstitutionally ineffective in several respects. Specifically, he claims that: (1) his counsel, both at trial and on appeal, failed to challenge his identity theft charge by arguing that Thomas did not "use" Oscar Corona's identity within the meaning of 18 U.S.C. § 1028A; (2) his attorney failed to challenge the loss amount on which his sentence was based by arguing that he did not receive credit for payments made to certain victims prior to the discovery of his scheme; (3) his counsel on appeal failed to challenge the loss amount by conducting additional forensic investigation; and (4) his counsel failed to challenge his restitution order by challenging

---

[1] Thomas asserts some of his claims against his trial counsel and some against counsel on appeal. (In other cases, it is unclear which of the two his claim is asserted against). However, Thomas was represented by the same attorney at trial and on appeal. Moreover, his arguments do not turn on the particularities of, or differences between, trial and appellate advocacy. Further, the standard for ineffective-assistance claims is the same for trial and appellate counsel. *See, e.g.*, *Warren v. Baenen*, 712 F.3d 1090, 1105 (7th Cir. 2013) ("The framework for assessing the constitutional effectiveness of appellate counsel is the same two-pronged *Strickland* test as for effectiveness of trial counsel.")(citing *Smith v. Robbins,* 528 U.S. 259, 285, 756 (2000); *see also Howard v. Gramley*, 225 F.3d 784, 789-90 (7th Cir. 2000)). For simplicity, therefore, I do not distinguish between Thomas's trial and appellate counsel in examining his ineffective-assistance arguments.
.

the court's determinations regarding the number of the scheme's victims. These claims are without merit.

## A. Aggravated Identity Theft

Thomas first argues that his attorney, both at trial and on appeal, was ineffective because she did not assert a particular argument to challenge his aggravated identity theft charge under 18 U.S.C. § 1028A. As noted above, the identity theft count was based on Thomas's use of Oscar Corona's name in connection with the phony sale of the property on South Langley Avenue. Although the jury found that Thomas had violated § 1028A by forging Corona's signature on documents used in arranging the transaction, Thomas's trial counsel spent a significant portion of her closing argument challenging the government's evidence on this point. *See* Tr. (Doc. #283) at 943:19-946:6. In addition, Thomas's direct appeal centered almost entirely on the identity theft charge. *See* Brief of Defendant-Appellant, U.S.A. v. Thomas, No. 12-3919 (7th Cir. Feb. 26, 2014); *see also* Oral Argument, U.S.A. v. Thomas (No. 12-3919), *available at* https://ecf.ca7.circ7.dcn/ cmecf/jsp/ca7/oarInternal.jsp?case year=12&casenumber=3919&listCase=List+case%28s%29.

Nonetheless, Thomas believes that his attorney should have argued that he did not "use" Corona's identity within the meaning of § 1028A. Section 1028A provides:

> Whoever, during and in relation to any felony
> violation enumerated in subsection (c), knowingly
> transfers, possesses, or uses, without lawful
> authority, a means of identification of another person
> shall, in addition to the punishment provided for such
> felony, be sentenced to a term of imprisonment of 2
> years.

18 U.S.C. § 1028A(a)(1). According to Thomas, he did not "use" Corona's identity because "[o]ne 'uses' a person's name under the aggravated identity theft statute ONLY if one either passes himself off as that person or acts on behalf of that person to secure something of value in the 'victims' [sic] stead." Reply Br. at 5. Thomas admits that listing Corona as the seller for the South Langley property was a misrepresentation. However, he maintains that he did not violate § 1028A because he did not "impersonate Corona, or pass himself off as Oscar Corona or as a managing authority for Corona Investments LLC, nor did he attempt to secure funding . . . for his personal use or attempt to obtain anything of value using Corona's name or stead[.]" *Id*.

Thomas's reading of § 1028A is incorrect. In ruling on Thomas's direct appeal, the Seventh Circuit specifically held that forging a person's name constituted "knowing use" for purposes of § 1028A. *United States v. Thomas*, 763 F.3d 689, 692–93 (7th Cir. 2014) ("Forging someone's name on a document is surely a knowing use of that name without lawful authority, and a name is a 'means of identification' within the meaning of the statute."); *see also United States v. Blixt*, 548 F.3d 882, 888

(9th Cir. 2008) ("[F]orging another's signature constitutes the use of that person's name for the purpose of applying the Aggravated Identity Theft statute.").

The cases that Thomas cites in support of his reading of § 1028A are inapposite. *United States v. Spears*, 729 F.3d 753 (7th Cir. 2013), for example, did not address the meaning of the term "use" under § 1028A. The defendant in *Spears* was asked by an associate, Payne, to make a fake gun permit for her, and Payne provided Spears with her personal information for this purpose. The question presented in the case was whether Spears had used a means of identification of "another person" within the meaning of the statute, given that the person whose information had been used had *asked* him to use it. *Id*. at 755. The court held that Spears had not violated § 1028A because "Section 1028A . . . uses 'another person' to refer to a person who did not consent to the use of the 'means of identification.'" *Id*. at 758.

Thomas's other cases address the meaning of the term "use" under § 1028A, but (in addition to originating from another circuit) they are readily distinguishable on the facts. In *United States v. Miller*, 734 F.3d 530 (6th Cir. 2013), for example, the defendant had signed a document in his own name that stated falsely that certain individuals had been present at a meeting of an organization and had given him authority to act

on their behalf. *Id.* at 542. Similarly, in *United States v. Wilcox*, No. 1:09-CR-140, 2010 WL 55964 (W.D. Mich. Jan. 4, 2010), the defendant was alleged to have filed several UCC Financing Statements to encumber various third parties, using his own name as the creditor and the victims' names as the debtors. *Id.* at *3. Although the courts in these cases held that the defendants did not "use" another's means of identification within the meaning of § 1028A, neither of the defendants, unlike Thomas, was alleged to have forged anyone's signature.

In short, Thomas's argument that he did not "use" Corona's identity for purposes of § 1028A is entirely unpersuasive. Accordingly, the fact that his attorney did not raise this argument in no way impugns her representation of Thomas. *See, e.g.*, *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel.").

### B. Loss Calculations

Thomas next claims that his counsel was ineffective for failing to raise a variety of challenges to the loss amount used in calculating his sentence. Thomas was held responsible for a total of $4,115,000. This figure was comprised of losses to

Coastal Funding ($1,370,000); First Funding ($2,420,000); and Jodi Funke ($325,000).[2]

Thomas claims to have identified several errors that he believes resulted in an overstatement of his loss amount. He argues that these errors would have been discovered if his attorney had conducted a forensic analysis of the financial documents in his case. Thomas further maintains that if these errors had been identified, his loss amount would have totaled $2,900,000 instead of $4,115,000. According to Thomas, this would have lowered his guideline range from 27 to 23 and made him eligible for a lower sentence.

Thomas's motion is very short on specifics. It identifies only one error -- a failure to deduct from his loss amount payments that he allegedly made to victims before his scheme was detected. However, Thomas's motion does not reveal how he had arrived at the figure of $2,900,000 as his actual loss amount. In any case, as the government pointed out in its response brief, even assuming that Thomas's calculations were correct, his guideline range would not have been reduced as a result. Thomas's sentence was enhanced by eighteen levels because his loss amount fell between $2,500,000 and $7,000,000. *See* Presentence Investigation Report ("PSR") at 11 ¶ 45. Even with a

---

[2] The Presentence Investigation Report noted that there was an additional intended loss of $1,580,000 based on loans that Thomas attempted to obtain but for which the funds were never disbursed.

reduction from $4,115,000 to $2,900,000, Thomas's loss amount would have remained within that range.

In his reply brief, Thomas offers a revised figure of $1,924,325 as his actual loss amount. If correct, this would indeed result in a reduction of the applicable guideline range. Thomas is also more forthcoming in his reply brief regarding the alleged errors made in calculating his loss amount. Specifically, he claims that: (1) the loss to Coastal Funding was inflated by $659,005 because it did not take into account interest payments received before his scheme was detected; (2) due to two accounting errors, the losses suffered by First Funding were overstated by $950,000; and (3) Jodi Funke suffered no monetary loss as a result of her transaction with him, resulting in an overstatement of the loss amount by an additional $325,000.

Unfortunately, Thomas's failure to divulge any of this information until filing his reply brief has left the government without a meaningful opportunity to respond to him. Arguments made or developed in this belated fashion are forfeited. *See, e.g.*, *Murphy v. Vill. of Hoffman Estates*, No. 95 C 5192, 1999 WL 160305, at *2 (N.D. Ill. Mar. 17, 1999) *aff'd*, 234 F.3d 1273 (7th Cir. 2000) ("Raising an argument generally in a motion or objections does not give a litigant license to be vague in his original submissions and provide the necessary detail in his

reply."); *see also Rand v. United States*, No. 08 C 6548, 2012 WL 1357677, at *3 (N.D. Ill. Apr. 18, 2012) ("Although [plaintiff] is proceeding *pro se* and the court is aware of its obligation to construe his petition liberally, the court will not address arguments made for the first time in a reply brief or in supplemental filings.") (citations omitted).

Thomas's reply is problematic in other respects as well. First, his calculations are difficult to follow and do not appear to add up to $1,924,325. (Indeed, under some scenarios, the amount is potentially less). Moreover, as detailed more fully below, although Thomas cites several exhibits in his reply brief, he does not explain how these documents are supposed to the support the propositions for which they are cited.

### 1. Coastal Funding

Thomas claims that interest payments received by Coastal Funding prior to the discovery of his scheme should have been deducted from his loss calculation. In support of this claim, he cites a document that he identifies as government exhibit CF-2 from his trial. Bearing the heading "Donell Thomas Transactions," the document consists of several columns that appear to show, *inter alia*, funding amounts and payments received. The document also includes hand-written notations in the margins indicating the differences between the amounts paid and received. Thomas claims that these amounts, which by his

calculations add up to $659,005, were returned to Coastal Funding before his scheme was discovered. When this sum is subtracted from Coastal Funding's loss amount, he asserts that its total loss is $711,005 instead of $1,370,000.[3]

Putting aside questions concerning the document's authenticity, and about the accuracy of Thomas's calculations -- and also ignoring the fact that portions of the document are illegible -- Exhibit A does not support Thomas's position. There is simply no way of ascertaining from this document whether the figures in the "Funding Amount" or "Payments Received" columns represent payments made to Coastal Funding, and if so, whether these were in fact used in determining Coastal Funding's loss amount.

Thomas states that his calculations are also supported by a document attached to his reply as Exhibit D. *See* Reply Br. at 12-13. Exhibit D (which Thomas cites in support of many of his other calculations as well) consists of nearly sixty pages of data that appear to be records of wire transfers and other transactions. There are several columns showing dates, dollar amounts, account numbers, as well as columns cryptically designated "ORP ID" and "Source CD." The formatting of the columns is not uniform throughout, raising uncertainty as to the

---

[3] Thomas appears to have computed incorrectly. The actual figure is $710,995.

source of the information. In some places, the column headings and other data are not legible. Above all, Thomas never cites to any page or range of pages to support his claims. Indeed, the document is not paginated. In short, in citing to Exhibit D, Thomas has saddled the court with the task of finding the proverbial needle in the haystack. Even taking into account Thomas's pro se status, this is unacceptable. *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."); *Mathis v. New York Life Ins. Co.*, 133 F.3d 546, 548 (7th Cir. 1998) ("As we have stated before, even pro se litigants ... must expect to file a legal argument and some supporting authority. A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority ... forfeits the point. We will not do his research for him.") (quotation marks, citations, and brackets omitted). Based on the information he has provided, Thomas has offered no reason to believe that his loss amount with respect to Coastal Funding was improperly tallied.

### 2. First Funding

Thomas claims that two errors were committed in calculating First Funding's losses resulting from his scheme. The first of these relates to transactions for three properties during the

period from September 3, 2008 to September 5, 2008: 1218 S. Harding ($655,000); 5652 S. Green ($680,000); and 6435 S. Campbell ($740,000). According to Thomas, he was held responsible for a loss of $2,075,000 in connection with these properties. However, he claims that Chicago Abstract Title's Fifth Third Bank escrow account records show that only $1,470,000 was sent by First Funding for the transactions. Hence, he maintains, First Funding's loss amount was overstated by $600,000.

Again, Thomas cites Exhibit D in support of his contention. Although he does not refer to a specific page within the document, the fact that his argument is tethered to specific dates provides something of a guidepost that may be used in sifting through the data. The records in one place indicate that four wire transfers were made on the dates in question: two were logged on September 4, 2008 -- $650,000 and $680,000 -- and two on September 5, 2008 -- $140,000, and $600,000. These add up to $2,075,000 (i.e., the correct amount). Thus, Thomas appears either to believe that the final transfer of $600,000 on September 5, 2008 did not come from First Funding (though he does not say so or offer any basis for thinking so), or he has simply overlooked the transfer altogether. In either case, Thomas has not shown that an error occurred in connection with calculations relating to these properties.

Second, Thomas contends that the government overstated his loss amount by an additional $350,000 in connection with another property funded by First Funding. He claims that $1,050,000 was sent by First Funding but that only $700,000 was "returned," leaving a balance of $350,000. Reply Br. at 16. Once again, Thomas cites to Exhibit D without further explanation or page reference. *Id.* at 17. As with Coastal Funding, therefore, Thomas has not shown that First Funding's loss amount was overstated.[4]

### 3. Jodi Funke

Lastly, Thomas claims that $325,000 was improperly added to the loss amount based on the testimony of Jodi Funke. As noted above, Thomas obtained a loan from Funke by pretending to be a closing agent employed by Forshay Land & Title. Thomas baldly

---

[4] Thomas also argues that First Funding, like Coastal Funding, received interest payments prior to the detection of his scheme. He maintains that these payments, which purportedly total $607,820, should have been credited against his loss amount. It is not clear how this figure was derived, or even which of the exhibits attached to his reply brief is supposed to support his position. *See* Reply Br. at 13. At one point, he cites Exhibits A and B in making this argument. But elsewhere, Thomas states that Exhibit A reflects payments to Coastal Funding, not First Funding. Yet Exhibit B (putting aside questions of authenticity) also appears irrelevant. The document is titled "First Funding Loan Sources" and appears to list various properties and their selling prices. On its face, nothing in the exhibit indicates that any money was repaid to First Funding. The amounts listed in the document cannot represent the interest payments Thomas refers to because, when added together, the total exceeds several million dollars.

I note separately, however, that when the amount allegedly repaid to First Funding ($607,820), together with the amount allegedly repaid to Coastal Funding ($659,005) is subtracted from the loss amount on which his sentence was based ($4,115,000), the amount is $2,848,175. Presumably, this is how Thomas arrived at the loss amount of $2,900,000 initially proposed in his motion.

claims that there is no evidence in Forshay Land & Title's escrow account records to establish such a transaction involving Funke. Again, Thomas fails to direct the court to any specific part of any exhibit to support his claim.

In short, Thomas has failed to show that any errors were committed in calculating the loss amount on which his sentence was based. Thus, the fact that his attorney did not challenge the loss amount based on these grounds does not indicate any error, much less constitutionally ineffective assistance of counsel, on her part.

### C.    Victims & Restitution

Thomas's final argument asserts that his counsel was ineffective for failing to challenge the court's determinations regarding the number of victims harmed by his scheme and the amount of restitution for which he consequently was held responsible. According to Thomas, "a victim means any person directly and proximately harmed as the result of a commission of an offense." Motion at 9. He asserts that he had no contact with many individuals who were found to be victims of his scheme. In addition, he claims that the court did not make explicit factual findings as to who the actual victims were. If his attorney had done so, he maintains, there would have been fewer victims and his restitution amount would have reduced by $925,000. Motion at 9.

As a threshold matter, these contentions cannot be raised here because challenges to restitution may not be brought in a § 2255 motion. *See, e.g.*, *Barnickel v. United States*, 113 F.3d 704, 706 (7th Cir. 1997). Nevertheless, for completeness, I note that findings were made regarding the number of Thomas's victims and their identities. As already described, these were Ryan M. Moore of Coastal Funding, Jeff Olson of First Funding Source, and Judie Funke of Funke Investments. *See United States v. Thomas*, 10 CR 642-1 (Doc. # 263) at 5 (Dec. 13, 2012) (Judgment in a Criminal Case). All of these individuals/entities, moreover, were "directly and proximately" harmed by Thomas's activity.

### D. Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings for the United States District Courts provides that a "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." *See* Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 11(a). "A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." *United States v. Valadez,* No. 08 C 3178, 2010 WL 3306937, at *8 (N.D. Ill. Aug.17, 2010) (quoting 28 U.S.C. § 2253(c)(2)). "To make a substantial showing the petitioner must show that reasonable

jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Span v. United States,* No. 07 C 2543, 2010 WL 3034240, at *18 (N.D. Ill. Aug. 3, 2010) (quotation marks omitted). Because I find no basis on which reasonable jurists might disagree with the foregoing ruling, I decline to issue Thomas a certificate of appealability.

### III. Conclusion

For the reasons discussed above, I conclude that Thomas's claims for ineffective assistance of counsel are without merit. Consequently, Thomas's § 2255 motion is denied and no certificate of appealability shall issue.


**ENTER ORDER:**


_____
          **Elaine E. Bucklo**
     United States District Judge


Dated: May 16, 2016